```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------------x

 3   MICHELLE ANN CICCIARELLA,
     individually and on behalf of all
 4   others similarly situated,

 5                    Plaintiffs,

 6           -against-                     19 Civ. 8785
                                           Bench ruling
 7   CALIFIA FARMS LLC,

 8                    Defendant.

 9   ------------------------------------x

10                                  United States Courthouse
11                                  White Plains, New York

12                                  July 9, 2020

13

14                    HONORABLE CATHY SEIBEL,
                                   District Court Judge
15

16

17   REESE RICHMAN LLP
             Attorneys for Plaintiffs
18   BY:  MICHAEL R. REESE

19           -and-

20   SHEEHAN & ASSOCIATES PC
     BY:  SPENCER SHEEHAN
21

22
     DAVID BIDERMAN
23           Attorney for Defendant

24

25
```

Angela O'Donnell, RPR, 914-390-4025

1          THE CLERK:  In the matter is Cicciarella v Califia

2    Farms LLC.  On the line we have for class plaintiffs

3    Mr. Michael Reese, and Mr. Spencer Sheehan, who is just

4    listening in.  And we have for defendant Mr. David Biderman.

5    Josh is on the line, and Angela is on the line.

6          THE COURT:  Good morning everybody.  Let me just

7    remind you that -- hold on one second.  Sorry.  Sorry, I had a

8    very loud air conditioner.

9          If you say anything, the first word out of your mouth

10   should be your last name.  Don't say:  This is Michael Reese

11   for plaintiffs."  Just say "Reese," so that the court reporter

12   knows right up front who is speaking.  And for the sake of the

13   court reporter, we will skip the usual pleasantries.

14          My first question is whether we have any objectors on

15   the line.  Is there anybody who's here to object to the

16   settlement?

17          NICOLE CROSS:  Cross, Nicole.  I am.

18          THE COURT:  I'm sorry, say your name again.

19          NICOLE CROSS:  Nicole Cross.

20          THE COURT:  Spell your last name.

21          NICOLE CROSS:  C-R-O-S-S.

22          THE COURT:  Cross, Ms. Cross.  All right, let me pull

23   up your written objection.

24          Mr. Reese, can you perhaps point me to which exhibit

25   to which document would contain Ms. Cross' objection, assuming

1    she submitted a written objection.

2          MR. REESE:  Good morning, your Honor.  Yes, we

3    submitted that to your Honor yesterday as part of plaintiffs'

4    supplemental reply because we did not receive Ms. Cross'

5    objection until actually earlier this week.

6          THE COURT:  Okay.

7          MR. REESE:  It's docket entry 26 filed on July 8 this

8    year, 2020, and Ms. Cross' -- it's Exhibit A.

9          THE COURT:  Yes, I found it.

10          MR. REESE:  Thank you, your Honor.

11          THE COURT:  Thank you.  It's document 26-1, but the

12    letter is dated May 18, 2020, but the envelope in which it

13    arrived was not postmarked until June 29th, which is after the

14    deadline, and it was sent to the lawyer rather than the claims

15    administrator, but it essentially raises the same issue that a

16    couple of other objectors raised, which is the misconception

17    that the penalty to consumers, that the payment to consumers

18    ought to be the same as the FTC penalty of 42,000 and change

19    per deceptive act.

20          Ms. Cross, if there's anything you want to add beyond

21    what's in your letter, I'll hear you now.

22          NICOLE CROSS:  I did want to add that I sent out the

23    letter to New York office and I didn't get a response, so I

24    resent it again through certified to everybody, and I see that

25    it did go through to the parties intended.

                    Angela O'Donnell, RPR, 914-390-4025

1    I am objecting because to me the $15 is unfair.  I've

2  been purchasing this product since 2015, and to me, I don't

3  mind paying for a higher price, which I do pay because I still

4  drink the product because I'm addicted to it at this point, but

5  to be deceived at the level -- what I'm saying is that I've

6  been drinking it since 2015, and I just don't like the fact

7  that I've been bamboozled because it's now $4 for each time I

8  have to purchase it, and that's just unreasonable for something

9  that I'm not really getting.  You know, you're told you're

10  getting one thing, and it's implied it's one thing, but it's

11  actually another.  Like I could have chose a whole different

12  brand for a cheaper price and used my money towards other

13  things.  I just don't feel that's fair.

14    THE COURT:  All right.  Thank you, Ms. Cross.

15    Is there anybody else who's here to object?

16    (No response)

17    THE COURT:  All right, I have a couple of questions

18  for Mr. Reese.  You report via your claims administrator that

19  you've gotten a little over 60,000 claim forms as of July 2nd;

20  has someone calculated the total dollar value of the claims,

21  how much of the 3 million is going to be paid out?

22    MR. REESE:  No, your Honor, and I would also note

23  that the claims period does not close until October 1st, so

24  we're a little over halfway through the claims period.  We're

25  receiving on average about 4,000 new claims a week.  We receive

1    a weekly update from the claims administrator, but the response

2    to your answer is no, that calculation has not taken place.

3            THE COURT:  Okay, I hadn't focused on the fact that

4    the claims period is still open.

5            And is what I'll call the ad campaign going to

6    continue through October?

7            MR. REESE:  Your Honor, I believe the ad campaign was

8    completed in early June.  The reach has been actually more than

9    your Honor suggested, it's 80.4 percent.  There are still

10    roughly the same amount of claims coming in because I think

11    that the campaign was widely spread and the claims can be made

12    online through the settlement website, and that, in fact, is

13    how most of the claims are being made.  I would say

14    99.9 percent of the claims are being made online.  I think 15

15    out of the roughly 60,000 claims have been mailed in.  So for

16    ease and convenience for the class members, they are taking

17    advantage of the online claim form.

18            THE COURT:  It wouldn't shock me if the numbers sank

19    the further out we got from the notifications, but we'll see.

20            Also a question about the class representative's

21    involvement in the litigation and how much time they spent on

22    the case.

23            First of all, were all the class representatives for

24    whom you're seeking a service award equally involved in the

25    case?

1          MR. REESE:  Yes, your Honor.

2          THE COURT:  And what exactly did they do?  Did they

3    give depositions?  Did they have to travel?  Did they go to the

4    mediation?  Did they review documents?  You know, what exactly

5    did they do and how much time did they spend doing it?

6          MR. REESE:  They spent a fair amount of time, I would

7    say several hours each reviewing documents pertaining to both

8    the complaints, the allegations in the complaint, the

9    settlement proceedings, including there were several

10   mediations, too, in front of Judge West, and one in front of

11   Judge -- I'm sorry, in front of Donald Morrow.  He's not a

12   judge, but he's an esteemed mediator with JAMS.  We

13   communicated with them extensively regarding both at the

14   mediations as we were drafting settlement papers and since

15   then.

16          No depositions occurred, but there is still extensive

17   work done.  And this, as we point out in the papers, this

18   matter -- there were two matters that this case would resolve

19   if the settlement's approved by your Honor that has been

20   pending for roughly two years.

21          THE COURT:  So they didn't attend the mediation, but

22   you conferred before, and during, and after; is that fair to

23   say?

24          MR. REESE:  That's correct, your Honor.  The

25   mediations were held in California in Orange County and some of

1  the plaintiffs were located in New York.  So we thought it made

2  sense, and we had the agreement of the defendants and the

3  mediator as well, that they could participate via phone.

4          THE COURT:  All right, let me tell you all where I

5  come out.

6          It's plaintiff's motion seeking final certification

7  of the class for settlement purposes only, approval of class

8  settlement and award of attorneys fees and costs to plaintiffs'

9  counsel and payment of incentive awards to the named

10  plaintiffs.

11          I presume everybody's familiarity with the underlying

12  facts and the procedural history of the case, and I incorporate

13  by reference the summary of facts and procedural history that I

14  provided when we convened on March 5th, as well as those set

15  forth in plaintiffs' memo in support of its motion, which is

16  docket entry 23-1 at pages 1 to 4.

17          Since that conference on March 5th, plaintiffs had

18  made three additional submissions at docket entries 23, 25 and

19  26, and they also I guess between March 5th and those

20  supplemental submissions plaintiff submitted supplemental

21  declaration and a proposed preliminary approval order that

22  addressed certain issues I raised at the conference,

23  specifically regarding the notice plan and removing language

24  concerning the injunction.  I granted preliminary approval on

25  March 20th, that's docket entry 22, and the motion, the instant

1    motion, was filed on the 28th of May.

2            The main terms of the settlement agreement are as

3    follows:

4            First of all, the class consists of all consumers in

5    the US who purchased the specific products during the class

6    period with certain exclusions.  The class period is August 7,

7    2014, through March 20th of this year.  The settlement amount

8    is capped at $3 million.  A settlement class member who submits

9    valid claim with proof of purchase will get a dollar for each

10   product purchased up to 20 products.  A member who submits a

11   claim without proof of purchase gets 50 percent up to a maximum

12   of ten.  The total value of claims submitted with proof of

13   purchase is capped at $2 million, and if it exceeds that

14   number, the benefit for each claim will be reduced on a pro

15   rata basis.  The total dollar value of claims submitted without

16   proof of purchase will be capped at $1 million with the same

17   reduction.

18           By plaintiffs' calculation, the inflated amount that

19   consumers paid for defendant's products as a result of the

20   deception, which defendants don't concede, is .61 cents, which

21   means that if the claims stayed within the cap, class members

22   will receive more than 100 percent of the inflated amount if

23   they have proof of purchase, and 81 percent of the inflated

24   amount without proof of purchase, although there may be class

25   members who purchased more than 20 products or 10 products.  So

1    that number may not represent all of their purchases.

2    Defendant agrees to make changes to its labeling as

3    part of the agreement within two years of final approval.  The

4    changes are in the settlement agreement at paragraph 3.1, (a)

5    through (f), and include specifying vanilla with other natural

6    flavoring rather than vanilla and/or reformulating as necessary

7    to make the ingredient panel reflect "vanilla extract with

8    other natural flavors," and also changing "chocolate" to

9    "cocoa" for another descriptor or reformulating, and changing

10   "hazelnut" to "hazelnut with other natural flavors" and so on.

11   Class counsel is requesting $750,000 in fees and

12   expenses, which is the maximum allowed under the agreement.

13   The defendant is responsible for all the fees and expenses

14   incurred by the claims administrator.  The agreement calls for

15   $5,000 per class representative as a service award for a total

16   of $30,000.  The fees, costs and service awards do not reduce

17   the settlement fund, they are on top of the fund.

18   And upon final approval, plaintiffs and the class

19   members will release defendants from any claims that could have

20   been asserted relating to labeling regarding vanilla,

21   carrageenan, chocolate, sugar, other ingredients, colors or

22   flavors.  Sorry.  Chocolate, nut, sugars, or other ingredients,

23   colors or favors.

24   And the parties agree that final approval will fully

25   resolve the case before me, as well as class claims asserted in

 1    the California state litigation.

 2         So turning first to Rule 23, as I claimed on

 3    March 5th, plaintiffs have shown numerosity, commonality,

 4    typicality, adequacy, ascertainability, predominance, and

 5    superiority, and I incorporate by reference my previous rulings

 6    on the 23(a) factors 23(b)(2) and 23(b)(3) requirements as well

 7    as plaintiffs' analysis in their memorandum at pages 18 to 24.

 8         Now with respect to final approval, Rule 23(e)(2)

 9    requires a hearing and a finding that the settlement is fair,

10    reasonable and adequate.  When a settlement is negotiated

11    before the class is certified, the proposed settlement is

12    subject to a higher degree of scrutiny in assessing its

13    fairness.  *In re Sony* 2008 WL 1956267 at *5 (S.D.N.Y., May 1,

14    2008).

15         In evaluating the fairness of a proposed settlement,

16    the Court must look at the procedural fairness, that is, the

17    negotiating process culminating in the settlement and the

18    substantive fairness of the settlement terms.  *See McReynolds*

19    *versus Richards-Cantave*, 588 F.3d 790, 804.  I have the

20    responsibility to determine whether the settlement properly

21    protects the interests of the absent class members weighing the

22    remedies the class will obtain from the settlement against the

23    probable costs and results of continued litigation.

24         Regarding procedural fairness, as I found on

25    March 5th, the evidence suggests the settlement agreement is

1    procedurally fair.  Class counsel engaged in substantial

2    discovery and negotiated the settlement with defendant at arm's

3    length after three full days of mediation with JAMS, which

4    raises a strong presumption of fairness.  *The City of*

5    *Providence versus Aeropostale*, 2014 WL 1883494 at *4 (Southern

6    District of New York, May 9, 2014) *aff'd*. 607 F.App'x 73; *see*

7    *also Elkind versus Revlon*, 2017 WL 9480894 at *17 (E.D.N.Y.,

8    March 9, 2017) Report and Recommendation adopted 2017 WL

9    1169552 (E.D.N.Y., March 29, 2017); *Stinson versus City of New*

10   *York*, 256 F.Supp. 3d 283, 289 (S.D.N.Y., 2017); and *In re Bear*

11   *Stearns*, 909 F.Supp. 2d at 259, 265 (S.D.N.Y., 2012), all of

12   which note that that having a neutral involved and arm's length

13   mediation sessions suggests procedural fairness.  Here, counsel

14   are also sufficiently experienced and have the requisite

15   ability to handle these types of cases, so I conclude the

16   settlement resulted from arm's length negotiations and that

17   counsel possessed the experience and ability and engaged in

18   sufficient discovery necessary to effective representation of

19   the class' interests.  Essentially for the reasons I outlined

20   at the preliminary approval stage, there's no evidence of bad

21   faith, fraud, or collusion, so I find the procedural fairness

22   requirement satisfied.

23          Turning now to substantive fairness.  I consider the

24   four factors set forth in new Rule 23(e)(2) in addition to the

25   nine so-called *Grinnell* factors, the courts in the Second

1   Circuit used before the recent amendments to Rule 23.  *See*

2   *Johnson versus Rausch, Sturm, Israel, Enerson & Hornik*, 333

3   F.R.D. 314, 320 (S.D.N.Y., 2019).  I won't take the time to

4   read the Rule 23(e)(2) factors.  We can all look them up or

5   know what they are.  Nor will I take the time to recite the

6   nine factors in *Detroit versus Grinnell*, they can be found at

7   495 F.2d 448, 463.  *See also McReynolds*, 588 F.3d at 804.  Not

8   every factor must weigh in favor of settlement, but rather the

9   court should consider the totality of the factors in light of

10  the particular circumstances.  *In re Global Crossing*, 225

11  F.R.D. 436 (S.D.N.Y, 2004).

12          In light of these factors, I find the settlement is

13  substantively fair, as I explained at the previous conference

14  and which I continue to believe.

15          First the complexity, expense, and likely duration of

16  litigation.  The issues are not terribly complex, but they're

17  not simple either, and further litigation would result in

18  additional and significant expense and delay.  The parties have

19  already undertaken considerable discovery but further

20  litigation without settlement would entail more discovery and

21  probably motion practice as well, including plaintiffs' likely

22  Rule 23 motion as well as defendant's potential decertification

23  motion.  Defendants have only agreed not to impose

24  certification as part of the settlement but in all likelihood

25  would if the settlement were rejected.  Then there would be

1   dispositive motion practice.  If the case survived that,

2   disposition of the issues would require a lengthy and costly

3   trial to establish liability and damages and then there would

4   be post-judgment appeal.  Accordingly, this factor weighs in

5   favor of settlement.

6           The next factor is the reaction of the class to the

7   settlement.  The deadline to object to opt out was June 11.

8   Nobody opted out, and only four class members timely objected.

9   Three others objected after the June 11 deadline.  So far the

10  claims administrator has already received 60,193 claim forms.

11  The small number of objections can be viewed as indicative of

12  the adequacy of the settlement.  *Wal-Mart versus Visa,* 396 F.3d

13  96, 118.

14          Turning to the objections, plaintiffs argue all of

15  the objections are improper because they lack declarations,

16  they failed to state whether the objectors intended to appear

17  today, and they were not submitted to the claims administrator

18  at the address stated in the notice.  Further, three of them

19  were untimely.  While that is all true, I will address the

20  objections anyway.  I find them insufficient to upset the

21  settlement.  Two of the objectors asked for mediation; one on

22  the grounds that the settlement amount is inadequate, and one

23  without explanation.  As discussed, however, the parties have

24  already engaged in mediation and those objectors provided no

25  reasoned basis for altering the settlement amount that that

1    mediation process generated.  The other five objectors

2    similarly state that the settlement amount is inadequate and

3    they contend they're entitled to over $40,000 under the Federal

4    Trade Commission Act, or FTC Act, for every mislabeled product

5    purchased from the defendant.  This amount appears to be

6    derived from the maximum civil penalty under Section 5 of the

7    FTC Act.  See 16 C.F.R. at section 1.98.  The most glaring flaw

8    with these objections is that there's no private right of

9    action under the FTC Act.  *Lokai Holdings versus Twin Tiger*

10   (S.D.N.Y., 2018).  And none of the objections explains why a

11   recovery of over 100 percent of the inflated amount of

12   defendant's products with proof of up to 20 purchases or

13   81 percent of the inflated amount without such proof for up to

14   ten purchases is inadequate.  As I'll discuss, there are risks

15   to this litigation, a possibility that any given class member

16   could end up with nothing.  So I overrule the objections and I

17   find that the overwhelmingly positive reaction of the class in

18   the settlement weighs in favor of approval.

19           The third factor is the stage of the proceedings and

20   the amount of discovery completed.  There's been considerable

21   discovery, so this factor also favors settlement.

22           The next two factors are the risks of establishing

23   liability and damages.  Plaintiffs' counsel explains that this

24   class action litigation is fraught with risks at every stage,

25   and at the end of the day, while plaintiffs believe a

1   reasonable consumer would find the challenged claims to be

2   misleading, a jury might not agree.  That is entirely possible.

3   The jury could find that there's nothing deceptive about

4   calling a product vanilla when, in fact, it contains vanilla

5   and tastes like vanilla.  Indeed, defendant has denied all the

6   claims or that anyone has suffered damages or harm as a result

7   of any mislabeling.  They deny there's any mislabeling to begin

8   with or any false marketing.  So if the litigation were to

9   proceed, at the very least plaintiffs' attempt to establish

10   liability would be met with resistance and a favorable outcome

11   is far from certain.  Likewise, because almost nobody maintains

12   their grocery receipts, the amount of damages that everybody

13   would be entitled to would be based simply on an individual

14   plaintiffs' word, which might be met with skepticism, and it

15   also might be met with skepticism whether the alleged

16   mislabeling would matter to every single class member.  So the

17   proposed settlement alleviates the uncertainty concerning the

18   outcome and duration of the litigation and the amount of

19   damages.  So it weighs in favor of approval even though there

20   likely are many class members who bought more than 10 or 20 of

21   the products, and therefore, they're not getting directly

22   100 percent or 81 percent of the inflated price, but even if

23   they're getting a much smaller percentage, they are still

24   getting something that's real and definite and they're getting

25   it now as opposed to having to wait perhaps three years and

16

1    perhaps not getting anything.

2           The next factor is the risk of maintaining the class

3    action through trial.  Defendants likely to challenge class

4    certification.  But as a practical matter, I don't see much of

5    a risk that plaintiffs will not be able to maintain a class

6    without the trial, so this factor weighs against the

7    settlement.

8           The ability of the defendant to withstand a greater

9    judgment is the next factor.  Plaintiffs concede defendant

10   probably can withstand a greater judgment, but that fact does

11   not, standing alone, indicate a settlement in unreasonable or

12   inadequate.  *In re Paine Webber*, F.R.D. 104, 129 (S.D.N.Y.,

13   1997), aff'd 117 F.3d 721.  That factor is neutral here.

14          And the last two factors are the range of

15   reasonableness of the settlement fund in light of the best

16   possible recovery and all the attendant risks of litigation.

17   To assess the range of reasonableness, courts factor in the

18   uncertainties of law and fact in any particular case and

19   concomitant risks and costs necessarily inherent in taking any

20   litigation to completion.  *Wal-Mart*, 396 F.3d at 119.  The

21   settlement agreement provides a refund for consumers with proof

22   of purchase of more than 100 percent of the inflated portion of

23   the price they paid for defendant's products up to 20, and

24   81 percent for consumers without proof of purchase up till 10

25   for a total value of $3 million.  This result, especially with

1    the latter group that doesn't have proof of purchase, may be

2    better than what could be achieved after trial, maybe not.  The

3    settlements agreement also provides injunctive relief as it

4    requires defendant to change its labeling so as to not mislead

5    anyone, and the continued litigation would be costly and

6    complicated.  Considering the costs of future litigation, the

7    risks attendant with moving forward with it and the relief the

8    class will receive, I'm satisfied that the settlement is a

9    reasonable compromise and this factor weighs strongly in favor

10   of settlement.

11            With respect to the Rule 23(e)(2) factors, I've

12   already explained that plaintiffs and class counsel have

13   adequately represented the class and that the settlement was a

14   result of arm's length negotiation.  I also find that relief

15   provided for the class is adequate taking into account the

16   costs, risks and delay of trial of appeal, as well as the

17   effectiveness of settlement administrator's method of

18   processing claims.  Further, the proposed award of attorney's

19   fees favors approval because it does not reduce the size of the

20   fund available to class members, and the only agreement under

21   23(e)(3) concerns how plaintiffs' counsel have agreed to split

22   the fees.  Additionally, the settlement treats class members

23   equitably relative to each other, as members who have purchased

24   more of defendant's products receive a greater settlement

25   amount up to a point than members who have purchased fewer and

1    class members without proof of purchase are still getting a

2    percentage, a significant percentage of the amount they

3    overpaid.

4         So finding the settlement both procedurally and

5    substantively fair, final approval is proper.

6         I now turn to the sufficiency of the notice.  There

7    are no ridged rules to determine the adequacy of notice in the

8    class action.  The standard is generally that of

9    reasonableness.  Notice need not be perfect, but only the best

10   notice practicable under the circumstances, and each and every

11   class member need not get actual notice so long as class

12   counsel acted reasonably in choosing the means likely to inform

13   potential class members.  *In re Merrill Lynch*, 249 F.R.D., 124,

14   132-33 (S.D.N.Y., 2008).

15        I appointed KCC to administer the notice process in

16   accordance with the proposes settlement agreement.  Since then

17   they've provided the notice to the class members using the

18   following methods:  One, direct notice via email to 18,650

19   class members who bought defendant's products through its

20   websites; two, publication in *USA Today*; three, publication on

21   various websites and social media platforms*, Facebook*,

22   Instagram and *Twitter*; four, the creation of a settlement

23   website; and, five, the maintenance of the toll-free hotline.

24   The claims professional estimates that the notice plan has

25   reached 80.4 percent of likely class members, an average of 2.7

1    times each.

2         The notice plan's multi-faceted approach to providing

3    notice to class members constitutes the best notice practicable

4    under the circumstances consistent with Rule 23(c)(2)(B).  *See*

5    *e.g.*, *In re Holocaust Victims Assets Litigation*, 105 F.Supp.

6    2d, 139, 144 (E.D.N.Y., 2000), which approved a plan which

7    involved direct mail, publication, press releases, and earned

8    media, internet, and other means.  The direct mail notice

9    complies with the rule that notice should be provided to

10   members who can be identified through a reasonable effort*, see*

11   *Eisen versus Carlisle & Jacquelin*, 417 U.S. 156, 173, and the

12   estimated percentage of identifiable class members who will

13   receive notice is in line with what other courts across the

14   country have considered adequate for purposes of due process

15   and Rule 23*.  See, e.g. Mayhew versus KAS*, 2018 WL 3122059 at

16   *9 (S.D.N.Y., June 26, 2018), which was a 70 percent reach*; In

17   re Building Materials*, 2014 WL 12621614 at *7 (D.S.C.,

18   October 15, 2014), which was above 80 percent*; In re Zurn Pex

19   Plumbing*, 2013 WL 716088 at *8 (District of Minnesota)

20   80.6 percent; and*, In re HP Ink Jet*, 716 F.3d 1173, 1176 (Ninth

21   Circuit, 2013), which reversed on other grounds a settlement

22   that was going to reach 74 percent of class members.

23        So I find the provisions regarding direct notice and

24   publication appear reasonable and adequately aimed at providing

25   actual notice to the class members.

1          Plaintiffs move for a $5,000 incentive award to each

2    of the named plaintiffs, that's Ms. Cicciarella, Ms. Rietsyk

3    Mr. Mitchell, Ms. Pena, Ms. Villanueva, and Ms. Landeros, for a

4    total of $30,000.  "In this circuit, the courts have with some

5    frequency held that a successful class action plaintiff may, in

6    addition to his or her allocable share of the ultimate

7    recovery, apply for and, in the discretion of the Court,

8    receive an additional award termed the incentive award.  The

9    guiding standard in determining a incentive award is broadly

10   stated as being the existence of special circumstances,

11   including the personal risk, if any, incurred by the plaintiff

12   applicant in becoming and continuing as a litigant, the time

13   and effort expended by that plaintiff in assisting in the

14   prosecution of the litigation, or in bringing to bear added

15   value, for example, factual expertise, any other burdens

16   sustained by that plaintiff in lending himself or herself to

17   the prosecution of the claim, and of course, the ultimate

18   recovery." *Roberts versus Texaco*, 979 F.Supp. 185, 200

19   (S.D.N.Y., 1997).

20         Here, the proposed incentive awards will not reduce

21   the amount available to unnamed class members, and $5,000

22   represents a tiny percentage, less than .02 percent, of the

23   total settlement fund, but $5,000 is 250 times the maximum

24   amount that a class member can receive, which is $20.

25   Plaintiffs have not identified any personal risks they've

1   incurred.  They, according to counsel, have expended time and

2   effort in conferring with plaintiffs' counsel and participating

3   indirectly in the mediation.  In one similar case, that's been

4   enough to justify an award of this size.  *See McLaughlin versus*

5   *IDT*, 2018 WL 3642627 at *15 (E.D.N.Y., July 30, 2018) where a

6   $6,000 was found appropriate where the class representatives

7   didn't run any risk, bring any special expertise or participate

8   in the case beyond consulting with their lawyers.  Report and

9   recommendation adopted in relevant part, October 16, 2018.  In

10  another similar case, $5,000 was found to be appropriate where

11  plaintiffs provided advice to counsel and participated in

12  settlement and mediation discussions.  *See Edwards versus North*

13  *American Power & Gas*, 2018 WL 3715273 at *13 (District of

14  Connecticut, August 3, 2018).

15          In other consumer protection lawsuits, however,

16  courts have required an reward of $5,000 to be justified as

17  reasonable at the fairness hearing.  *See, e.g., Elkind versus*

18  *Revlon*, 2017 WL 9480894 at *18 (E.D.N.Y., March 9, 2017), which

19  requires the proposed award of $5,000 to be justified where the

20  named plaintiffs did not risk anything or lend special

21  expertise, R&R adopted 2017, WL 1169552 (March 29, 2017); and,

22  *Berkson versus Gogo* (E.D.N.Y., 2015) to the same effect.

23  Absent a more significant showing, a lot of cases have found

24  2500 to be a more appropriate incentive award.  *See, Pantelyat*

25  *versus Bank of America*, 2019 WL 402854 at *10 (S.D.N.Y.,

1    January 31, 2019); *Melito versus American Eagle*, 2017 WL
2    3995619 *16 (SDNY, September 11, 2017), aff'd in part, appeal
3    dismissed in part, 923 F.3d 85; and, *Zink versus First Niagara*,
4    2016 WL 7473278 *4-5 (W.D.N.Y., December 29, 2016); and, *In re*
5    *Sinus Buster*, 2014 WL 5819921 at *19 (E.D.N.Y., November 10,
6    2014).

7         Given the representations made by counsel this
8    morning and the fact that the $5,000 is not going to come out
9    of the amount available to the class members, although it is a
10   close call, I will approve the proposal that the named
11   plaintiffs get $5,000.  The case has gone on for some time, so
12   the consultations with counsel were time consuming, and counsel
13   has represented that they, the plaintiffs did -- what were
14   involved in the mediation through counsel.  So although I think
15   $2,500 would be reasonable as well, I will approve the $5,000
16   given that it's not coming out of the pockets of the class.

17        Turning to attorneys fees.  Class counsel seek fees
18   and reimbursement of expenses of $750,000, which is 25 percent
19   of the settlement fund.  Again, this amount is in addition to
20   and does not reduce the amount of the settlement fund.  That
21   fact reduces my role in overseeing the award because there's no
22   conflict of interest between the attorneys and the class
23   members.  *Schwartz versus Intimacy in New York*, 2015 WL
24   13630777 at *6 (S.D.N.Y., September 16, 2015).  Class counsel
25   in a class action settlement may be entitled to a reasonable

1    fee.  *Pantelyat* *8, quoting *Goldberger versus Integrated*

2    *Resources*, 209 F.3d 43, 47.  "Whether a fee in a common fund

3    case is reasonable may be determined by using either the

4    lodestar method, in which the court ascertains the number of

5    hours reasonably billed to the class, multiplies those hours by

6    a reasonably hourly rate and applies any appropriate

7    adjustments, or by setting a reasonable percentage of the

8    recovery as a fee.  In light of the strong consensus, both in

9    this circuit and across the country, in favor of awarding

10   attorneys fees in common fund cases as a percentage of the

11   recovery, the court applies the percentage-of-the-fund method

12   in this case with a lodestar cross-check to confirm its

13   reasonableness." *Pantelyat* at *8.  Under either method, the

14   courts evaluate the reasonableness of the resulting fee by

15   considering the following factors articulated in *Goldberger*:

16   One, counsel's time and labor; two, the case's magnitude and

17   complexities; three, the risk of continued litigation; four,

18   the quality of the representation; five, the fee's relation to

19   the settlement; and, six, public policy consideration.  Under

20   these metrics, I find that 25 percent of the settlement fund is

21   fair, reasonable -- as a fee award equivalent to 25 percent of

22   the settlement fund is fair, reasonable, and adequate.

23          Looking first at the *Goldberger* factors, they favor

24   approval on balance.  Plaintiffs' counsel spent a collective

25   1098.55 hours on the lawsuit, which began in California state

1     court in August 2018 and this court in September 2019.  This is

2     not a huge number of hours and settlement during the early

3     stages of the litigation weighs against the large award, but

4     substantial discovery was conducted, and the speed with which

5     the litigation was resolved can also reflect high quality

6     representation.  *See Pantelyat* at *9.  The quality of counsel's

7     representation is also reflected in the favorable recovery

8     achieved for the class in terms of money and injunctive relief.

9     As I've stated, the issues are not terribly complex but they're

10    not simple either, and there would be significant risk if

11    litigation continued, making a favorable damages award far from

12    certain.  A fee amounting to 25 percent of the settlement fund

13    is comparable to or lower than what other courts have found

14    reasonable in similar cases.  *See Pantelyat* at *9 where it was

15    25 percent; *Melito* at 20 where it was 30 percent.  And here,

16    where individual lawsuits against the defendant would not be

17    viable due to the dollar amounts involved, public policy favors

18    rewarding counsel for pursuing the claims as a class.  *See*

19    *Pantelyat* at *9.  Additionally, the fact that plaintiffs'

20    counsel negotiated the amount for fees and costs only after

21    reaching agreement as to the relief for the class, also weighs

22    in favor of its reasonableness.  *See Shapiro versus JPMorgan*,

23    2014 WL 1224666 at *25 (S.D.N.Y., March 24, 2014).

24              I next perform a lodestar cross-check to verify the

25    reasonableness of the requested fees in which I multiply the

1   number of hours reasonably expended by the prevailing rates for

2   the services provided to generate a lodestar figure and compare

3   that figure to the requested fees.  The lodestar should be

4   based on prevailing market rates.  *Pantelyat* at *9.

5        Class counsel calculates the lodestar at $879,762.50.

6   I came out to a number that was $739.50 lower by summing up the

7   amounts stated in counsel's declarations.  Regardless, the

8   requested $750,000 is less than the lodestar, it's about

9   80 percent of the lodestar.  But to reach that amount counsel

10  use hourly rates that average 800 an hour with the range of

11  $775 to $975 per hour for partners and $525 to $600 per hour

12  for associates, which are significantly higher rates than those

13  used in district in comparable litigation.  *See Schwartz* 2015

14  WL 13630777 at *7, which collects cases and describes an

15  average of $462.50 per hour for partners as being on the high

16  end of reasonable rates.

17       These rates to my mind are not the prevailing market

18  rates, particularly the associate rates are higher than the

19  market will bear.  Even if I have counsel's hourly rates,

20  however, their lodestar would be $439,863.25, which would make

21  the requested $750,000 approximately 1.7 times the lodestar

22  amount.  This is well below multipliers that have been found to

23  be reasonable in similar cases.  *See, e.g., Pantelyat* at *10.

24       So I find the total fee request to be fair,

25  reasonable, and adequate.  I am not finding the hourly rates to

1    be appropriate, and should in ruling make its way into any

2    future applications, counsel should make clear I am not finding

3    those hourly rates to be fair and reasonable, but I am finding

4    the total fee to be fair and reasonable because even if I cut

5    those rates in half, the multiplier is only 1.7.

6            I also find that the litigation expenses of

7    $29,657.42 are reasonable.  If I didn't already say it, I also

8    find the hours that were put in to be reasonable.  So I approve

9    counsel's request for $750,000 in fees and expenses.

10            So the motion is granted, and if they haven't

11    already, plaintiffs are to submit a proposed order in

12    accordance with this ruling, and the Clerk of Court is to

13    terminate motion number 23.

14            Mr. Reese, have you given me a proposed order or will

15    you give me one in the next few days?

16            MR. REESE:  Yes, your Honor, we will.  One question

17    for your Honor.  Do you want us to first get the transcript so

18    that we can cite the cases that you just read into the record?

19            THE COURT:  I don't think you need to do that.  I

20    think you can say, for the reasons stated on the record and on

21    this date, and then just put the conclusion.  I don't think you

22    have to include the reasoning.

23            MR. REESE:  Thank you, your Honor.  And I think we

24    did this with the preliminary approval order, I email to your

25    chambers; is that correct, your Honor?

```
 1              THE COURT:  Yes, that's fine.  And if you would,
 2    email it in Word format in case we want to tweak it at all.
 3              MR. REESE:  Understood, your Honor.  Thank you very
 4    much.
 5              THE COURT:  All right.  Anything else we should do
 6    this morning?
 7              MR. REESE:  Not on behalf of the plaintiff.  Thank
 8    you again, your Honor, for your time and consideration of this
 9    matter.
10              MS. MABEL-DOROTHY:  How do we get to speak?
11              THE COURT:  I'm sorry --
12              MS. MABEL-DOROTHY:  My name is Qadriyyah Safiyyah
13    Mabel-Dorothy, Q-A-D-R-I-Y-Y-A-H, S-A-F-I-Y-Y-A-H,
14    Mabel-Dorothy.  M-A-B-E-L, hyphen, D-O-R-O-T-H-Y.
15              THE COURT:  Are you a member of the class, ma'am?
16              MS. MABEL-DOROTHY:  I am a member of the class.  Yes,
17    ma'am.
18              THE COURT:  And are you here to object?
19              MS. MABEL-DOROTHY:  No, ma'am, I'm not here to object
20    at all.  I want to be grateful and appreciative of all the work
21    that have gone into this case.
22              I wrote to Michael Reese to let him know that the $15
23    for the non-receipt amount I know comes with a higher
24    compensation than the 15, and I didn't hear that conversation
25    in this proceeding at all, other than when you calculated that
```

1    the $15 based on the no receipt is 50 cents, and the cost

2    difference between Califia Farms and let's say Almond Breeze

3    was like .61 cents.  So that's the only conversation I heard

4    about the $15, and so I'm wondering when is Michael Reese going

5    to bring in the conversation he and I discussed.

6              THE COURT:  All right.  Well, I see that you sent an

7    email to Mr. Reese.  At the beginning of the proceeding I asked

8    if anybody was here to object to the settlement and one person

9    spoke up, but I didn't hear that you were there.  I did

10   address, and I don't know if you were on the line --

11             MS. MABEL-DOROTHY:  Yes, because I'm not objecting,

12   your Honor, I'm not objecting to the settlement.  I just said

13   I'm in agreement with all that you said, and that's why I was

14   listening to hear if there was more for me to agree to and I

15   didn't hear -- I didn't hear class members receiving the full

16   compensation that is available to us, only the compensation

17   that was agreed to.

18             THE COURT:  Well, that's right.  That's how it works

19   with a settlement.  I mean, the defendants claim they didn't do

20   anything wrong and that if this case went to trial, they would

21   win.  Plaintiffs obviously claim the opposite, and when cases

22   settle, the plaintiffs get less than what they would get if

23   they prevailed, and the defendants pay more than what they

24   would pay if they prevailed.  So you are correct that what

25   you'll be getting if you don't have proof of purchase is less

 1   than the overpayment but --

 2           MS. MABEL-DOROTHY:  Right, but that's what I'm

 3   saying, your Honor, that's not the calculation.  Like the

 4   calculation for this violation isn't based on the difference

 5   between which milk I bought.  That's not how you base the

 6   calculation.  And if we went to trial and we won, then $15 is

 7   less than 1 percent of what you would get if you won.  So like

 8   that's what I'm saying -- that's why I said it's insufficient.

 9           THE COURT:  Well --

10           MS. MABEL-DOROTHY:  Being this is the final hearing,

11   this is when we would talk about its insufficiency, but I

12   didn't hear that get discussed.

13           THE COURT:  Well, I did talk about this because other

14   people raised the same argument that you mention in your email

15   that the deceptive act makes you entitled to 40,000 times 15,

16   and I think you're getting that from the FTC Act, and I did

17   discuss this, and maybe you weren't on the line at the time

18   but --

19           MS. MABEL-DOROTHY:  I've been here.  I was here the

20   whole time.

21           THE COURT:  One of the factors I did discuss is the

22   reaction of the class to the settlement, and I discussed people

23   who wrote, whether they used the word objection or not, the

24   people who wrote in, and there were a total of people five

25   people who wrote in saying that they are entitled to $40,000

```
1   under the Federal Trade Commission Act for every mislabeled

2   product, and that's just incorrect under the law.  There's

3   no -- individuals don't have any right to relief under the FTC

4   Act, only the government can bring claims like that.  So it's

5   actually not true that a consumer is entitled to $40,000 for a

6   product, and I did mention that at the beginning.  So I

7   overruled those objections, which you're not the only one who

8   raised it, but it's just not a correct statement of the law,

9   unfortunately.  So the --

10          MS. MABEL-DOROTHY:  Okay, so what my question was was

11  to Michael Reese, as class counsel, isn't that a conversation

12  for him to have when I am having the conversation with him and

13  also because you just discussed his fee, and you just discussed

14  all the work he did, and as a class member, he didn't do no

15  work on my behalf.  In fact, if I'm telling him that I think I

16  get $40,000 because the FTC says something, and you're telling

17  me that 40,000 goes to the government, it doesn't go to me,

18  then Mr. Reese, as my class counsel, has all the wherewithal to

19  find out what fees come directly to the consumer so that we

20  don't keep having class actions where the class members get $20

21  to $15 and the attorney is getting $700,000 and the cost to

22  maintain a 800 number that you just told them to put up is

23  going to receive more moneys based on a $20 claim?

24          So I'm saying to Mr. Reese, as my class counsel, that

25  you include in the fees that he just did work in, I just told
```

1   you what he did.  So I feel like if there's a way for you to

2   calculate the five people that he blatantly ignored and could

3   have worked on our behalf, there is a way for you to calculate

4   that like the abandonment of class members.  Where's that act?

5        THE COURT:  I will say two things, one is, he should

6   have responded to your email.  He is your lawyer.  He brought

7   it to my attention that he received this on July 3rd.  It looks

8   like it was originally sent on May 28th, and I don't know why

9   there was no response to that.

10        I think he took the email, and he'll correct me if

11  I'm wrong, as an objection, not as a question, but the fact

12  remains that this is what always happens in class actions.

13  This is a case where there's no one individual for whom it

14  would make sense economically to bring this lawsuit.  So it

15  wouldn't make sense for you to go out and hire a lawyer and pay

16  the lawyer hundreds of dollars an hour to sue the defendant

17  over your own personal purchases of milk.  It only makes sense

18  to do cases like this on behalf of a lot of consumers.  And in

19  deciding whether to approve the settlement, one of the things I

20  look at is the reaction of the class to the settlement.  What

21  we had here is over 60,000 people were fine with the settlement

22  and there were I think eight who weren't.  So that's one of the

23  things I look at.

24        The fact of the matter is nobody is going to sue

25  individually.  So nobody is going to get anything apart from

1    the class action.  The 40,000 that some people were under the
2    mistaken impression they're entitled to, they're not entitled
3    to.  And it's a settlement, and a settlement means to avoid the
4    uncertainty of the outcome, and it's by no means certain that
5    the plaintiffs would prevail here, and to get the money now
6    instead of years from now, and to avoid all the risks and
7    delays of litigation, the plaintiffs are going to agree to take
8    less than they think is ideal, and the defendants are going to
9    agree to pay more than they think is ideal, and both sides are
10   going to be less than fully satisfied, and that's usually the
11   sign of a good settlement.
12          So I appreciate your points.  You make some good
13   points, which is, there are sometimes class actions where you
14   don't see very much benefit for the class and the only people
15   who make out are the lawyers, but this is not one of those
16   cases.  This is a case where so far 60,000 plus people are
17   going to get money, not a lot of money, but they wouldn't get a
18   lot of money even if the plaintiffs ran the table here.  So
19   this is not the kind of case where anybody's going to retire
20   off of.
21          MS. MABEL-DOROTHY:  Your Honor, I have two statements
22   to make after what you just said.
23          First of all, as a class member, am I privy to --
24   what was it, 60,000?  Did you say 60,000 or 6,000?
25          THE COURT:  The number of people who have made claims

1    is a little bit over 60,000.

2              MS. MABEL-DOROTHY:  60,000.  60,000.  Okay.  So,

3    those are not the active class members, the ones who brought

4    this class action to the court; right?

5              THE COURT:  There are six named plaintiffs who

6    brought the case, and then there are 60,000 class members who

7    put in claims.

8              MS. MABEL-DOROTHY:  Exactly.  So you know how you

9    just said that the six original ones who brought the case they

10   get incentive pay for like, you know, just having the energy

11   and wherewithal to stay consistent.  What do the people who did

12   that as well that are not a part of the case, where do those

13   incentive comes in for us?  Because it just seems like you're

14   intentionally calculating a lot for the bulk of the class

15   members.  It literally seems like your math is suggestive of we

16   weren't going to get anything anyway, we weren't going to bring

17   it individually, and if we did we wouldn't get anything, so

18   unless you get this quick $20 while we can -- how is that even

19   legal math?

20             THE COURT:  Well, I'm not going to --

21             MS. MABEL-DOROTHY:  The courts are supposed to be for

22   the people.  It hasn't sounded yet like your math is equally

23   for the people.  It sounds like your math is equaling for the

24   corporation, they didn't pay as much as they were going to pay

25   if they keep going with this, and the attorneys who, you know,

1    they did get their fair share, even though I told you they

2    ignored the people, and are we going to hear from Michael Reese

3    as to why he ignored us?

4         THE COURT:  So I'm not going to get into an argument

5    with you, Ms. Mabel-Dorothy.  I've spent an hour putting on the

6    record my analysis of the motion to approve the settlement and

7    if you haven't made a claim, you don't have to make one.  But

8    I'm approving the settlement.  I've considered all the factors

9    I'm supposed to consider under the law.  And I understand not

10   everybody is satisfied with it, but the law doesn't require

11   100 percent of the class to be satisfied with it.  And on

12   balance, considering all the factors, I do find it is

13   beneficial for the class, and that's my ruling.

14        So if there's nothing further, I'm going to expect

15   Mr. Reese to submit his proposed order, which I will take under

16   consideration.

17        All right, everybody, please stay safe and well, and

18   I'm going to ring off at this time.  These proceedings are

19   concluded.

20        (Proceedings concluded)

21   CERTIFICATE:  I hereby certify that the foregoing is a true and
     accurate transcript, to the best of my skill and ability, from
22   my stenographic notes of this proceeding.

                   _____
23   Angela A. O'Donnell, RPR,Official Court Reporter, USDC, SDNY

24

25


                 Angela O'Donnell, RPR, 914-390-4025